Damien Linton v. James J. Saba Mr. Doyle, good morning. May it please the Court. My name is James Doyle. I'm representing Damien Linton, the petitioner-appellant in this case. This case involves a February 2005 homicide by manual strangulation. During the course of the trial, the trial judge admitted over objection the hearsay account via the decedent's father of an incident that had happened the preceding September. That account fell into two parts. The father testified to receiving a hysterical phone call from his daughter going to the scene. His daughter recounted certain things about Petitioner Linton's conduct. The father then went and interviewed Linton, returned downstairs, took his daughter from the scene of this event. The daughter, on the way from the scene to his family's home, although crying and upset still at that time, did give a coherent retrospective account of what had happened. What she said had happened was that Linton had strangled her to unconsciousness and then she had regained consciousness and left the scene. The Supreme Judicial Court affirmed the conviction, found that this is not testimonial and therefore not governed by the Confrontation Clause analysis that the Supreme Court has given us in Crawford. But in doing that, the Supreme Judicial Court did not rely on Crawford. It relied on a case of its own called Commonwealth v. Gonzalez and quoted the language from that case, which we maintain differs in a significant way from Crawford. In Crawford, the rule for this particular category of potentially testimonial hearsay is that it would be reasonably, an objective witness would reasonably believe under the circumstances that the statement would be available for use at a later trial. Gonzalez adds to that by saying that the test would be that the declarant would anticipate the statement being used against the accused. In other words, the standard used by the SJC in this case is not availability, as the declarant would see it, but availability plus actual use. We believe that that is a very significant change from the rule, one that heightens the stringency of the definition of testimonial and therefore lowers the barrier against the admissibility of testimonial evidence. There are cases in this court assessing the testimonial nature of a statement in which this court has held statements to be not testimonial. But there is a distinction in those cases that I would hope to bring to the court's attention. First of all, I'd like to point to one moment in this court's jurisprudence where in the Maher opinion authored by Judge Lynch, there is a reference to a statement. The opinion says in this statement it would have been evidence to the declarant that it would be used in the trial. I'm paraphrasing, but that's essentially the point. However, I don't believe that that statement in its context is an effort by this court to modify the Crawford rule. In Maher, it was a statement that had been held by this court to be testimonial in a case where there was a cooperation agreement. And I believe the observation about it would be reasonable to anticipate this being used in court is an observation, essentially, that a fortiori this case will meet the testimonial standard because not only is it available, it would be apparent to anybody who has been involved in signing the cooperation agreement that this would be used in the trial. In other cases, there are features where the proponent of the evidence claiming that it is not testimonial could point to features in the exchange that a reasonable declarant would have seen to undercut a possibility of availability. Inmate-to-inmate statements, drug dealer-to-drug customer statements, statements of those kinds, a statement in the Castro case where it is a statement to his mother, but it's a statement in which the declarant is incriminating himself, and it's apparent that he's not attempting to generate evidence for prosecution later on. In this case, what the SJC's use of the Gonzales standard, rather than the Crawford standard, does, is that it creates a situation where the declarant needs to resolve, at the time of the statement, a series of contingencies. For example, a whole host of contingencies that are covered by the question, I have said this now, will anyone be interested in using it, and will it therefore be used? Yeah. Let's assume that Crawford has the test that you've articulated and that Gonzales is a materially different test. In this case, could it conceivably have made any difference, given the nature of the outer court statement, which seems to me to be a person in stress and fear calling for help? It just seems that one could argue, or how would you respond to the argument that under either one of those tests, there was no way that this was a testimonial statement by the decedent? If we were talking solely about the first conversation between the decedent and her father, I would have to concede Your Honor's point. But the content that's injurious, in terms of the defendant's rights here, is the content of the second conversation, after the period where the emergency has been resolved, after the period where the father has gone and spoken with Linton, after the father has returned downstairs, during a period where the father and daughter are privately together, taking her to a place of safety. And so this, we believe, not only conceivably could, but actually did create a situation where it does make a difference. Now, there are cases in this court, for example, in dealing with excited utterance cases in United States v. Brito, where we're dealing with a 911 call, where it is said, in Judge Sellier's opinion in that case, that what we have here is a range of emotional responses, where there will be people who will be hysterical at the moment of extreme danger. Once the moment of extreme danger passes, those people may be more alert and may be better consequential, better aware of the consequences long term of what they are saying. What we do have here is a situation where it's very difficult if you approve the Crawford test and you ask the proponent of this evidence, what is it that indicates, from these circumstances, that the declarant would not expect this evidence to be preserved and available? It's very difficult to find anything here. This is not a statement to a fellow prisoner who could be expected to adhere to some prisoner's code of silence. Do you have any single case that supports your contention that this is a testimonial statement? You're sort of arguing from the negative. Well, yes, I am arguing from the negative, and I'm arguing from the well-understood proposition that each of these cases has to be considered on its individual merits. Yes, of course, but what case supports your assumption that this was testimonial and therefore it would have made a difference? I'm not making an assumption, Your Honor. I'm making an argument, and the argument is that there is no specific case that fact matches or color matches this set of circumstances. There would never be. But do you have any case where one relative is relating to another relative, much less a daughter to a father, some recent event? I mean, that's what people normally do about big events in their life. They talk to other people about it, why one would think that was testimonial. I have trouble even imagining her state of mind in terms of her thinking that this was testimonial. I can understand it if someone is being interviewed by a police officer. They may think it's testimonial, but a daughter talking to a father about something that just happened that was very traumatic? Well, a daughter talking to a father about a serious crime in which police intervention would appear to be something that under any circumstances people would be considering doing. But she had made the decision, hadn't she, not to call the police? She never called the police. I don't believe the record does not disclose that, Your Honor. What the record discloses... Is there anything in the record that she ever complained to the police about this initial strangulation? No, Your Honor, but that's why the change that requires a declarant to resolve contingencies to meet the testimonial threshold is so significant. It's not true that there's anything in the record that said at the time of the statement, which is the time we're concerned with, she had made a decision not to call the police. There is on the record evidence that she had decided to call the police first and that she had told her father and that the reasonable expectation would be that the father, an upstanding law-abiding citizen, would make this evidence of this narrative available to the police should the police show any interest in it. I can see that my time has expired unless there are any questions. May it please the Court, Assistant Attorney General Todd Bloom for the Respondent James Sava. Your Honors, there are two issues before this Court, both of which are reviewed under AEDPA's deferential standard, sufficiency of the evidence first, as well as an alleged violation of the Confrontation Clause. First, regarding sufficiency of the evidence, the petitioner challenges insufficient evidence of identity as well as extreme atrocity or cruelty. Regarding identity, the Commonwealth presented overwhelming circumstantial evidence of guilt, including motive, opportunity to commit the crime, as well as consciousness of guilt. First, the jury could infer from the evidence presented at trial that the petitioner's affair with Latricia Carter motivated him to kill the victim. The victim confronted him with Latricia Carter Wednesday morning, the morning she died, and Carter testified at trial that the petitioner thought she was his, quote, soulmate, and then later said that she didn't want to hear anything the petitioner had to say after the confrontation. Shirley Harvey, the victim's mother, also testified that the petitioner told her that the victim was difficult to live with, that if he needed money, she found it hard to give it to him, and that he was not used to being bossed around by any woman. The medical examiner also estimated that the victim could have been killed as early as midday on Wednesday. There is ample evidence that the petitioner was in the apartment at that time. There were three landline calls made from the apartment, the final one at 1232 p.m. There was testimony at the trial from both the victim's parents that the petitioner's mother lives in Jamaica, and these calls were all made to Jamaica. From this, the jury could infer that the petitioner was in the apartment at least as late as 1232 p.m. There was also a videotape showing the petitioner withdrawing money from an ATM machine at 1.30 p.m., which is only a 10-minute walk from the apartment, and the petitioner called Latricia Carter also around 1.30 p.m. and said, I have to pack a bag and leave. This also indicates that he was in the area at the time. There were also no signs of forced entry. The door was locked, and there is testimony that the petitioner is one of few people who had the key to the apartment and that the petitioner admitted to Trupo Heseltine on Friday that he locked the door to the apartment when he left and he had the keys on him at that time. The petitioner also fled Massachusetts afterwards and gave conflicting stories as he did so. On Wednesday at 7.51 p.m., there was a phone call to the victim's cell from the New York City bus terminal. On Thursday, he called the mother and said that the victim was there when he woke up at 8 a.m. Wednesday and that he left for North Carolina at 10 a.m., and then on the same phone call, he told the father that the victim had gone to the store when he woke up and had not returned by the time he left. He also gave conflicting stories to Trupo Heseltine on Friday and Saturday morning about how and when he rode to Florida. Could you move on to the question of the cruelty of the murder and whether there was adequate evidence to support that? Yes, Your Honor. I would say that the prosecutor did not have the burden of showing that this killing was slower or more painful than the average murder by strangulation to support a finding of extreme atrocity or cruelty. The SJC was not bothered by this possibility. The SJC found as a matter of state law that the prosecutor had to show this killing was extremely atrocious or cruel with regard to one or more convenient factors, and here the medical examiner's testimony showed that the victim sustained seven abrasions on her neck caused by the petitioner's fingernails digging into her skin, that he strangled the victim for at least 90 seconds while she was conscious before she lost consciousness, that he separated the hyoid bone at the base of her tongue about, quote, about as hard as a person could squeeze with his hand. This caused the capillaries in both of her eyes and her eyelids to burst, and it made her bite her own tongue as she struggled to breathe, and there was also a deep hemorrhage into her rib cage, which the medical examiner testified was consistent with the knee. I would submit that this relates to several convenient factors, including the indifference to the victim's suffering, the high degree of conscious suffering, as well as the overwhelming force applied during the strangulation. Turning to the confrontation issue, I would submit that the SJC did not change the Crawford test for the reasons stated in my brief on page 40, and under either test, even if they did, even if Gonzales has a different test, under either test the SJC properly identified that the issue turns on whether the statements in this case are testimonial, and there is no evidence in the record that the primary purpose of this conversation was to gather evidence for the prosecution. The evidence in the record is to the contrary. There is no indication that the victim was trying to create a substitute for in-court testimony. The statements were made to her father while she was crying, hysterical, basically to the effect that the petitioner just choked her until she passed out, and this is still within the situation where she called her father for help. If there are no further questions, I will rest in my brief. Thank you.